929 So.2d 204 (2006)
Garrett GRIGGS and Stephen Livaudais
v.
HARRAH'S CASINO, Jazz Casino Corporation and IGT, Incorporated.
No. 2005-CA-0321.
Court of Appeal of Louisiana, Fourth Circuit.
March 22, 2006.
*206 Jacques F. Bezou, the Bezou Law Firm, Covington, Counsel for Plaintiff/Appellee, Garrett Griggs.
Lloyd N. Frischhertz, Jr., Frischhertz and Associates, New Orleans, Counsel for Plaintiff/Appellee, Stephen Livaudais.
Ira J. Rosenzweig, Stacy R. Palowsky, Adams, Hoefer, Holwadel & Eldridge, L.LC., New Orleans, Counsel for Defendant/Appellant, IGT, Inc.
(Court Composed of Judge TERRI F. LOVE, Judge LEON A. CANNIZZARO, Jr., Judge ROLAND L. BELSOME).
LEON A. CANNIZZARO, Jr., Judge.
This case involves a dispute over whether the plaintiffs, Garrett Griggs and Stephen Livaudais, won a slot machine jackpot. IGT, Inc., one of the original defendants in the case, is now appealing the trial court's decision in favor of the plaintiffs.

STATEMENT OF FACTS AND PROCEDURAL HISTORY
At approximately 12:30 a.m., the plaintiffs went to Harrah's Casino in New Orleans and gambled in the casino for several hours. As they were leaving the casino between approximately 8:00 and 8:30 a.m., they decided to play some games on a Wheel of Fortune progressive slot machine.[1] Mr. Griggs and Mr. Livaudais each contributed one half of the $40.00 that was inserted into the machine when they began playing. Mr. Livaudais played two rounds on the machine but did not win anything. Mr. Griggs then began to play.
Mr. Livaudais and Mr. Griggs testified that when they played the rounds on the machine that they did not win, the machine was operating normally. There were three reels on the slot machine, and if a jackpot was won, all three reels would line up on the payline showing the words "Wheel of Fortune." The reels did not line up, however, until the round in question in this lawsuit was played.
According to the testimony of both Mr. Griggs and Mr. Livaudais, when Mr. Griggs played that round, he pushed the spin button on the machine to begin a new round of play, and all three reels on the machine started spinning normally making several complete rotations. Then, according to their testimony, the first reel stopped, and the Wheel of Fortune symbol on that reel lined up on the machine's payline. Next, the second reel stopped, and the Wheel of Fortune symbol on that reel lined up on the machine's payline. Finally, the third reel stopped, and the Wheel of Fortune symbol on that reel lined up on the machine's payline. Mr. Livaudais testified that when the symbols were lined up on the payline, blue and white lights on the machine came on, and he heard the machine emit a different sound from the one that he had been hearing. Mr. Livaudais, who was not familiar with the Wheel of Fortune television show theme song, said that he did not recall hearing the machine play a theme song. Mr. Griggs testified, however, that he did hear the theme song.
Mr. Livaudais and Mr. Griggs testified that they knew that they had won a jackpot, *207 but neither of them knew that they had won the progressive jackpot. They also said that they began to celebrate their win.
Mr. Livaudais testified that the three reels on the Wheel of Fortune slot machine were stationary with the three Wheel of Fortune symbols remaining on the payline for twenty to thirty seconds. Mr. Livaudais further stated that shortly after the three reels showing the Wheel of Fortune symbol stopped on the payline and the blue and white lights came on, a Harrah's employee arrived at the slot machine and opened it. He said that when the machine was opened, the three reels started spinning in a slow, jerking motion and the blue light went off. Mr. Griggs recalled that after the machine showed that a jackpot had been won, a slot machine technician "stuck his card in the top of the machine," something that Mr. Griggs recognized as normal procedure. Then the technician inserted a key in the side of the machine to open its door. Mr. Griggs "did not feel he [the technician] needed to be there messing with the machine until the appropriate people were there," and he attempted to prevent the technician from doing anything further with the machine.
Two eyewitnesses to the alleged winning of the jackpot testified at the trial. The two eyewitnesses were Ronnie Westley and Adolph M. Ringen.
Mr. Westley described himself as a "lurker" at the casino. He explained that as a lurker he tried different machines trying to get a "hit." He would watch a person playing a machine to determine how it was "playing," and when the person left the machine, Mr. Westley would try his luck on the machine.
Mr. Westley testified that while he was watching Mr. Griggs play the Wheel of Fortune slot machine, "their machine hit." Mr. Westley said that he saw the three Wheel of Fortune symbols line up on the payline, and he saw white and blue lights start to flash. He estimated that the symbols remained evenly aligned on the payline for ten to twenty seconds. Mr. Westley did not remember whether he heard any difference in the sounds emitted by the slot machine after the three reels lined up with the Wheel of Fortune symbols on the payline.
Mr. Westley further testified that a "tech" inserted a key into the side of the slot machine and was "unlocking the machine." When that happened, he observed that the blue light was no longer on. He also said that the technician stated that the machine had malfunctioned, and Mr. Westley related that the "tumbling" was then "hesitating, going around and stopping." Mr. Westley additionally testified that he had won jackpots before and that, therefore, he knew how a slot machine indicated that a jackpot had been won. He stated that he was "[o]ne hundred percent" positive that he saw a jackpot being won on the Wheel of Fortune machine played by Mr. Griggs.
Mr. Westley said that he had not known the plaintiffs prior to the time that they won the jackpot on the slot machine. He also admitted that he initially did not want to help Mr. Griggs, because he thought Mr. Griggs was being ill mannered. When Mr. Griggs ultimately "came down to earth," however, Mr. Westley decided to give a statement when casino personnel said that because the slot machine had malfunctioned, a jackpot had not been won.
The second eyewitness to the events in question was Mr. Ringen. He testified that he goes to casinos "[q]uite regularly" and has won "some significant jackpots." Mr. Ringen also testified that he was playing at the dice tables in Harrah's casino *208 when Mr. Livaudais and Mr. Griggs were at the Wheel of Fortune slot machine. Mr. Ringen had been playing at that same machine earlier, and he was watching the plaintiffs play, because "I was looking over there to see if they, per chance, might win something; which, you know, as a gambler, you're always, you know, `That jackpot could have been mine.'" Mr. Ringen said that the dice table was located diagonally across from the slot machine.
Mr. Ringen testified that he observed the plaintiffs at the slot machine "in between rolls or in between other people rolling the dice." He related that he had "kind of turned away, and all of a sudden you hear a scream." He said that he knew a jackpot had been won. He looked at the machine where the elation was occurring, and "sure enough, there were the three Wheel of Fortune emblems on the silver payline that indicates that they had won the progressive jackpot." Mr. Ringen explained that when he was looking at the machine, he "was focusing on the payline." When Mr. Ringen was asked at the trial whether he had heard any particular sounds signifying that a jackpot had been won, he said that he did not remember any sounds but that he was hard of hearing and was not wearing his hearing aid at the casino. Mr. Ringen also said that a blue light and a white light came on while the Wheel of Fortune symbols were aligned on the payline of the slot machine, but on cross-examination, Mr. Ringen at one point seemed unable to say with absolute certainty that he saw the white and blue lights on the machine flashing.
Mr. Ringen testified that "[t]he wheels were frozen on the jackpot position on the payline for a length of time, and then all of a sudden, they started to roll." He said that he had witnessed tilts[2] in slot machines before but that what was occurring on the Wheel of Fortune machine "was very irregular as far as a tilt that I've ever witnessed." Although Mr. Ringen could not say how long the three Wheel of Fortune symbols remained aligned on the payline, he did say that "it was enough time to witness it."
Mr. Ringen testified that "within ten minutes," a slot machine technician "came and they opened the machine and took out what ... they call the board or the chip... and they removed that." Mr. Ringen further said that he went over to Mr. Livaudais and Mr. Griggs to ask them whether they had wagered "the three coins or ... one coin or two coins." They would have been eligible to win the progressive jackpot only if they had wagered the maximum bet of three coins. Because the reels had begun to roll after all three of the Wheel of Fortune symbols had stopped on the payline, he wondered if the rolling occurred, because the maximum bet had not been wagered.
Mr. Ringen testified further that he had not seen Mr. Livaudais or Mr. Griggs do anything to the machine, such as moving it, kicking it, or hitting it, that could cause a tilt. Mr. Griggs also testified that neither he nor Mr. Livaudais had done anything that could cause the machine to tilt, including putting slugs in the machine. Mr. Griggs said that he was not using the arm of the slot machine to play the machine, which can sometimes cause an inadvertent tilt to occur. Instead, he used the button on the machine to play.
Mr. Griggs and Mr. Livaudais testified regarding the events that occurred after the plaintiffs appeared to have won the jackpot on the Wheel of Fortune slot machine and the technician had opened the machine. The technician and another man *209 who worked for the casino left the area, and two other men, who were wearing suits, approached. Louisiana State Police Department officers were with the two men wearing the suits. Mr. Livaudais testified that the casino representatives told Mr. Griggs and him that the Wheel of Fortune slot machine had malfunctioned, and they were asked to "sign a piece of paper and leave the casino." He also said that they were threatened with arrest if they did not leave. Mr. Griggs described the piece of paper mentioned by Mr. Livaudais as a disputed claim form. When Mr. Livaudais realized that the jackpot win was being disputed by the casino representatives, he telephoned his uncle, Lloyd N. Frischhertz, Jr., who is the attorney representing Mr. Livaudais in this case, for advice.
Thomas Livaudais, Mr. Livaudais' father, testified regarding the events that occurred after his son called Mr. Frischhertz. Mr. Thomas Livaudais had spent the night at Mr. Frischhertz's home, and when Mr. Livaudais called, Mr. Thomas Livaudais answered the telephone. He said that his son was "frantic" and "pretty hysterical" and wanted only to speak with Mr. Frischhertz. Before Mr. Frischhertz came to the telephone, Mr. Livaudais told his father that he had "hit the jackpot at Harrah's Casino and they won't give us our money."
Mr. Thomas Livaudais testified that he and Mr. Frischhertz both went to the casino where they saw "maybe thirty people from Harrah's Casino and a few State Police and some other officials all standing around ...." Some of the Harrah's officials told Mr. Thomas Livaudais and Mr. Frischhertz what had occurred. Mr. Thomas Livaudais related that Mr. Frischhertz told the officials not to touch the Wheel of Fortune slot machine, because he was going to obtain a court order regarding what should be done with the machine.
At the trial, several witnesses testified regarding how a slot machine works and the method used to verify that a jackpot has been won on a slot machine. Ali Saffari, Senior Vice President of Firmware and Operating Systems at IGT, testified that he had worked for IGT for almost eighteen years. He had degrees in accounting and management, information systems and computer science, and electrical engineering. He explained that gaming machines are heavily regulated by the states and must meet strict standards of quality so that the machines are random, are fair to the players, and comply with the applicable state law requirements for gaming machines.
Mr. Saffari explained that a jackpot from a slot machine is determined through the process of random number generation, which means that a computerized system that has been programmed to select numbers at random determines whether a jackpot is won. Based on the random number selected, each reel on a slot machine stops at a particular location that corresponds to a number selected at random by a computer. It is these randomly generated numbers that determine whether or not a jackpot has been won. If a malfunction occurs and the random numbers are not selected by the computer, there can be no jackpot. Therefore, to verify whether or not a jackpot has been won, an independent gaming laboratory may be used to confirm the jackpot by analyzing the computer microprocessor[3] from the slot machine where the jackpot was allegedly won.
*210 Mr. Saffari testified that in the instant case the slot machine computer detected a problem with the third reel on the Wheel of Fortune machine. He stated that because a problem was detected, the slot machine then indicated that a tilt had occurred, and no random numbers were generated by the computer. Without the generation of random numbers, a jackpot cannot be won.
Mr. Saffari said that when a jackpot is won, there are certain things that happen to indicate that it has been won. He confirmed that when a jackpot is won, the three Wheel of Fortune reels stop on the payline and remain there for at least ten or twenty seconds and a white light and a blue light are illuminated.
IGT also called Michael Jensen as a witness at the trial. Mr. Jensen was the national operations manager for the mega jackpots department at IGT. He explained that the Wheel of Fortune slot machine involved in the instant case was owned by IGT and that IGT was solely responsible for paying any progressive jackpots won on that machine.
Mr. Jensen testified that when a jackpot is won on a Wheel of Fortune slot machine, the Wheel of Fortune theme song plays continuously, the bells on the machine ring, and the "candle" on the top of the machine flashes. The candle has two sections, the top of which contains a white light and the bottom of which contains either a blue, red, or orange light. When a jackpot is hit, both sections of the candle flash very fast and very frequently. In the case of a tilt, however, only the top portion of the candle, the white light, flashes. Mr. Jensen further stated that the reels remain frozen in place after a jackpot has been won until the game has been reset after the jackpot is verified.
Lieutenant George Dean, who had been a gaming officer in the Louisiana State Police Department for twelve years, testified regarding casino operations. He said that the state police department oversees casino operations. He also explained the meaning of the phrase "malfunction voids all pays and plays" that was located on the Wheel of Fortune slot machine at issue in this case. He said that if a slot machine malfunctions, the game is not complete. Therefore, there is no play, and if there is no game, there can be no payout. Additionally, Lieutenant Dean said that casinos are not required to maintain constant surveillance of slot machines, although such surveillance is required for gaming tables.
Lieutenant Dean further testified regarding the procedures followed by the state police when a large jackpot has allegedly been won in a casino. He said that the casino slot technicians notify the slot managers. The managers are actually on the floor of the casino supervising its operations. The managers then notify the security personnel and the surveillance personnel at the casino. The surveillance personnel are required to "zoom a camera into the location of the machine" when a jackpot is won on a slot machine. Lieutenant Dean testified that he had not, however, seen a film of the slot machine taken with a zoom lens in connection with the jackpot allegedly won by the plaintiffs.
Pursuant to state law, the state police oversee the activities involved in determining whether a jackpot has, in fact, been won. Lieutenant Dean confirmed that police personnel under his command conducted an investigation in the instant case. As a result of the investigation, it was determined that a jackpot had not been won. Gaming Laboratories International, commonly known by the acronym GLI, was consulted in connection with the investigation. GLI is an independent testing laboratory for gaming equipment, and it is used by government gaming regulators *211 worldwide to test equipment for compliance with applicable laws. GLI tested the microprocessor from the slot machine in the instant case and concluded that there had been no random number generation by the microprocessor.
Lieutenant Dean confirmed that in the instant case the technician's insertion of a card into the Wheel of Fortune slot machine, the opening of the machine with a key, and the removal of the machine's computer component after the jackpot was allegedly won were all required to be filmed pursuant to state regulations. He admitted, however, that he had not seen such a film.
Charles Johnson, who was the slot supervisor at Harrah's when the alleged jackpot was won, testified at the trial that tilts are normally cleared by opening a slot machine, correcting the problem that caused the tilt, and closing the machine. The machine is then put back in service. After a Harrah's slot technician summoned Mr. Johnson regarding the Wheel of Fortune slot machine on which the plaintiffs allegedly won the progressive jackpot, Mr. Johnson observed that the reels on the machine were spinning, that a light was flashing, but that the Wheel of Fortune theme song was not playing. He testified that what he observed indicated that a malfunction had occurred. He said that when a jackpot is won, the reels on the machine stop and lock in place, the white and blue lights flash simultaneously, and the Wheel of Fortune theme song plays continuously. He also said that in the case of some types of reel tilts, both the white light and the blue light on the machine flash.
Finally, Mr. Johnson confirmed that a reel tilt code for the third reel of the machine was recorded and reported on Harrah's monitor at 8:32:30 a.m. and that the IGT monitoring report of the reel tilt reflected that it occurred at 8:29:47 a.m. A Harrah's surveillance videotape, however, showed that the lights on the machine started flashing at 8:23 a.m. Mr. Johnson could not explain why a reel tilt was not recorded until almost ten and seven minutes, respectively, after the casino's videotape showed that the lights had begun to flash.
James Edward Oatman, the GLI engineer[4] who personally performed the forensic evaluation of the Wheel of Fortune slot machine to determine what occurred when the jackpot was allegedly won by the plaintiffs, testified at the trial. Mr. Oatman was qualified as an expert in slot machine operation, programming, and forensic evaluation. Based on his forensic evaluation, Mr. Oatman determined that the Wheel of Fortune machine on which the plaintiffs allegedly won a jackpot had malfunctioned before any random number generation had occurred. Therefore, the plaintiffs could not have won the progressive jackpot that they claimed to have won.
A film was made of Mr. Oatman as he performed the forensic testing. Although a replica of the slot machine was used in the tests he performed, he used the original data from the actual microprocessor that was removed from the Wheel of Fortune slot machine at Harrah's. Mr. Oatman testified that the data from the microprocessor definitively showed that the third reel of the slot machine had tilted as shown by the code fifty-three that was displayed. That code is displayed only when a tilt occurs in connection with the third reel. Mr. Oatman said that when the reels were spinning prior to the generation of the random numbers for the game being played, a problem with the third reel was *212 discovered by the machine. The machine was programmed not to select random numbers until the tilt was cleared. Thus, Mr. Oatman concluded that there had been no random number generation, and no jackpot could have been won.
Mr. Oatman was asked at the trial about a statement that he made on the videotape of the forensic evaluation to the effect that "the outcome was lost." Mr. Oatman confirmed that he misspoke when he said that. He further asserted that no data from the machine was lost. Additionally, he said that if a jackpot had been won, and then a tilt had occurred after the jackpot had been won, the win would have remained in the memory of the computer in the slot machine. Mr. Oatman also testified that he "absolutely" did not believe that the three Wheel of Fortune symbols had been stationary on the payline for twenty seconds. He did admit, however, that if, in fact, a surveillance tape had clearly shown that this had occurred, he would question his data.
The deposition of Orval Todd Rich, the plaintiffs' expert witness, was read at the trial. He was accepted by the trial court judge as an expert in slot machines, "specifically progressive slot machines with regard to the manner in which they operate and run to completion and display an outcome." In his deposition, Mr. Rich testified that he had been in military service and that when he left the service, he had the equivalent of a bachelor's degree in electronics and hydraulics and robotics. His first job in the gaming industry was with GLI, which he said was the "foremost independent laboratory as far as the testing of gaming equipment in the world." Mr. Rich testified that while he was employed by GLI, he tested over a million slot machines, assisted in opening over fifty casinos, and trained certain gaming personnel but not slot technicians. He also assisted the engineers when IGT installed its first progressive slot machines in Louisiana.
Mr. Rich further testified that he had tested progressive slot machines with respect to all aspects of the machines' play to verify that the machines were functioning properly. He had also been the lead field agent for Harrah's temporary casino in New Orleans, and in that capacity, he had been required to verify that the casino met state regulations in connection with the progressive slot machines at that location.
Mr. Rich admitted in his deposition testimony that he had neither inspected nor tested the Wheel of Fortune slot machine involved in the instant case or its microprocessor. He also stated that he had not reviewed the computer program that operated the Wheel of Fortune machine, and he further admitted that he did not know how to program a computer.
In forming an opinion regarding the events that occurred when the plaintiffs allegedly won the progressive jackpot on the Wheel of Fortune slot machine, Mr. Rich reviewed a number of items, including the surveillance videotape of the plaintiffs playing the slot machine, affidavits of eyewitnesses, the applicable state gaming regulations, and reports from the state police department and from GLI. Mr. Rich testified that after reviewing these items, he relied on the eyewitness accounts of the events that occurred to form an opinion that the Wheel of Fortune slot machine played by the plaintiffs was properly operating when random number generation occurred and that the plaintiffs legitimately won the progressive jackpot on that machine.
Mr. Rich further opined that the random numbers that were generated in connection with the winning jackpot were stored in the temporary memory of the slot machine's computer and that the temporary *213 memory was "lost or corrupted at the time of the slot machine being powered off and powered on." He further testified in his deposition that "you would lose present play values by turning off the machine and turning it back on." Mr. Rich said that in the case of a reel tilt, one would "simply clear the rear [sic] tilt usually done by a key switch on the side of the machine." The machine would not be turned off to do that. If a reel tilt on a slot machine cannot be cleared with the key switch and there is a question regarding the winning of a jackpot on that machine, according to Mr. Rich's testimony, the appropriate procedure would be "to shut the machine off and before repowering it send the boards in question to GLI and allow them to look at it on their equipment there."
Another witness at the trial was James Maida, the president and chief executive officer of GLI. Mr. Maida, who held a degree in engineering and computer science as well as a law degree, was accepted as an expert in slot machine operations, programming, and the flow sequence of program and analysis.
Mr. Maida testified that GLI's conclusion, after testing the processor from the Wheel of Fortune slot machine at issue in this case, was that a reel tilt involving the third reel on the machine had occurred during the initial revolution of the reels. He further stated that no random numbers were ever generated and that the game was never started. Thus, because of the tilt, no game was played, and no jackpot was won.
Mr. Maida strongly disagreed with Mr. Rich's position that any values were lost from the Wheel of Fortune machine's temporary memory. Mr. Maida acknowledged that he had heard Mr. Oatman say on the videotape of the forensic testing conducted by GLI that the game was lost. Mr. Maida testified, however, that Mr. Oatman had simply misspoken. Mr. Maida further testified that although the reels on the slot machine could have come to a complete stop as a result of the reel tilt, they "would not have stayed there ten seconds."
In the instant case Harrah's Casino, Jazz Casino Corporation, and IGT were sued by the plaintiffs, but the only defendant remaining at the time of the trial was IGT. There were two trials in the instant case. The first trial ended in a mistrial, because the jury was unable to reach a verdict. The second trial ended in a verdict in favor of the plaintiffs with ten out of the twelve jurors finding in favor of Mr. Livaudais and Mr. Griggs.
The trial court judge originally rendered a judgment in favor of the plaintiffs awarding them $1,357,692.36 plus interest from the date of judicial demand until paid plus the costs of the proceedings. IGT filed a motion for a new trial on the grounds that the evidence at the trial had conclusively shown that the jackpot allegedly won by the plaintiffs was payable in twenty annual installments rather than in a single lump sum. Additionally, taxes would have to be withheld from the winnings, and the original judgment did not reflect that. The trial court granted the motion for a new trial, and an order was issued amending the judgment to provide that the jackpot "shall be paid to the plaintiffs in the same manner as if the jackpot had been won and verified on July 9, 2000 with legal interest from the date of judicial demand." IGT also filed a motion for a judgment notwithstanding the verdict, but that motion was denied by the trial court. The instant appeal is from the original judgment, as it was amended by the order.

STANDARD OF REVIEW

Findings of Fact
In Rosell v. ESCO, 549 So.2d 840 (La. 1989), the Louisiana Supreme Court stated that it is well settled that an appellate court may set aside a factual finding of a *214 trial court or a jury only where the finding was based on a "manifest error" or was "clearly wrong". Id. at 844. Further, where there is conflict in the testimony, a trial court's or a jury's reasonable evaluations of credibility and reasonable inference of fact should not be disturbed on appeal, even though the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court or jury. Id. Finally, where there are two permissible views of the evidence, the trial court's or jury's choice between them cannot be manifestly erroneous or clearly wrong. Id. See also Harvey v. Cole, 00-1849, p. 3 (La.App. 4 Cir. 1/23/02), 808 So.2d 771, 776.
If the trial court or a jury has based its findings of fact on a determination regarding the credibility of the witnesses, the manifest error or clearly wrong standard of review requires even greater deference to the findings of the trier of fact. Rosell, 549 So.2d at 844. This is because only the finder of fact can be aware of the variations in the demeanor and tone of voice of the witnesses that bear so heavily on the listener's understanding of and belief in what is said. Id.
In LeBlanc v. Stevenson, 00-0157, p. 3 (La.10/17/00), 770 So.2d 766, 770, however, the Louisiana Supreme Court stated that "[a]lthough the appellate court must accord deference to the trial court, it is cognizant of our constitutional duty to review facts, not to decide if it, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support." A trial court's factual finding may not be reversed unless (1) the record reflects that a reasonable factual basis for the findings does not exist, or (2) the record establishes that the findings are clearly wrong or manifestly erroneous. Id.
Where the findings of the trier of fact are manifestly erroneous or clearly wrong, or where the correct law has not been applied in reaching those findings, the Rosell case instructs the appellate courts as follows:
Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required to redetermine the facts de novo from the entire record and render a judgment on the merits.
549 So.2d at 844, n. 2.

Errors of Law
With respect to issues of law, the appellate court is required to determine whether the trial court's decisions are legally correct. Glass v. Alton Ochsner Medical Foundation, 02-0412, p. 3 (La. App. 4 Cir. 11/6/02), 832 So.2d 403, 405. See also Sander v. Brousseau, 00-0098, p. 4 (La.App. 4 Cir. 10/4/00), 772 So.2d 709, 711. Where a decision of a court is based on an erroneous application of law rather than a valid exercise of discretion, the trial court's decision is not entitled to deference from the reviewing court. Kem Search, Inc. v. Sheffield, 434 So.2d 1067, 1071-72 (La.1983).

DISCUSSION
IGT has raised five assignments of error. We will examine each of them using the applicable standards of review.
Assignment of Error A: The jury and the trial court erred as a matter of law in determining that the plaintiffs met the legal requirements for a jackpot.
Assignment of Error B: The jury and the trial court ignored the evidence and manifestly erred in concluding that the plaintiffs won a jackpot.
Because these two assignments of error are interrelated, we will discuss *215 them together. The issue raised by both assignments is whether the jury's determination that the plaintiffs won the progressive jackpot on the Wheel of Fortune slot machine is supported by the law and the evidence.
IGT asserts that because the outcome of a game played on a slot machine is determined by the generation of random numbers by a computer that is located inside the slot machine, eyewitness evidence is a legally insufficient basis for determining whether or not a jackpot has been won on a slot machine. IGT further asserts that because the sufficiency of the evidence in a case is a question of law, the manifest error standard of review is inapplicable in the instant case.
The Louisiana Gaming Control Law, La. R.S. 27:1 et seq., established the Louisiana Gaming Control Board, which is responsible for regulating all gaming activities and operations in the state. La. R.S. 27:15. The Louisiana Gaming Control Board is mandated by La. R.S. 27:24 to promulgate all rules and regulations necessary to carry out the provisions of the Louisiana Gaming Control Law. Pursuant to that mandate and in accordance with the Louisiana Administrative Procedure Act, La. R.S. 49:950 et seq., the board has promulgated the required regulations.
The regulations provide that all electronic gaming devices "shall be electronic in design and operation and shall be controlled by a microprocessor or micro-controller or the equivalent." 42 LAC IX:4203(A)(1). See also 42 LAC IX:4329(A)(1). The regulations further provide that a random selection process must be used to determine the outcome of each play of a game. 42 LAC IX:4203(A)(3), 42 LAC IX:4329(A)(3). Additionally, the devices must be able to continue a game without any loss of data if a power failure occurs. 42 LAC IX:4203(A)(9), 42 LAC IX:4329(A)(9). The regulations also state that electronic gaming devices shall display an accurate representation of the outcome of each game by using either (a) rotating wheels, (b) video monitoring, or (c) any other type of display mechanism that accurately depicts the game's outcome. 42 LAC IX:4209(A)(2)(e)(viii). Finally, the regulations require rules of play to be displayed on all electronic gaming devices. 42 LAC IX:4203(A)(5), 42 LAC IX:4329(A)(5). The phrase "any malfunction voids all plays and pays" was conspicuously displayed on the Wheel of Fortune slot machine at issue in this case.
None of these regulations are in dispute. Both the plaintiffs and IGT agree that before a jackpot can be won, there must be random number generation by a microprocessor housed within the Wheel of Fortune slot machine. The parties similarly agree that if a malfunction in the Wheel of Fortune slot machine occurs, the game is void and no jackpot can be won.
The parties disagree, however, on the type of proof that is required to show that a jackpot has been won. The proof offered by IGT consisted of forensic tests conducted on the microprocessor that was housed in the Wheel of Fortune slot machine played by the plaintiffs. The tests were designed to determine whether random number generation had occurred on the slot machine to produce a winning combination. The proof offered by the plaintiffs consisted of eyewitness testimony that the slot machine played by the plaintiffs performed in the same manner that a slot machine performs when a jackpot is won. According to eyewitness testimony, the reels, the use of which is one of the three permissible methods for displaying an accurate representation of a game outcome as required by 42 LAC IX:4209(A)(2)(e)(viii), all stopped and remained *216 stationary on the machine's payline for approximately twenty seconds. Other evidence consisted of the eyewitness testimony that the other indicia of a jackpot win were also displayed by the Wheel of Fortune machine played by the plaintiffs. The eyewitnesses testified that the indicia of a jackpot win on the Wheel of Fortune machine ceased only when a slot technician opened the machine.
In the instant case, we find that there is sufficient evidence to support the jury's finding of fact that a jackpot was, in fact, won by the plaintiffs. Four people testified that they saw the indicia of a jackpot win. They described in detail what they saw, and their descriptions of what they observed matched the descriptions given by IGT's witnesses of how the Wheel of Fortune slot machine visually and aurally indicates that a jackpot has been won. The jury could well have concluded that the outward manifestation of a jackpot win was evidence that the computer inside the Wheel of Fortune slot machine had caused the win to occur through its random number generation. We also note that Mr. Oatman, the engineer who conducted the forensic testing of the microprocessor from the Wheel of Fortune slot machine at GLI, admitted that if, in fact, a surveillance videotape had clearly shown that the three Wheel of Fortune symbols had remained aligned and in position on the payline for twenty seconds, he would question his forensic data.
IGT's position that a winning combination for a jackpot must be the result of computerized random number generation is legally correct. Had the forensic testing of the Wheel of Fortune's microprocessor shown that random number generation had occurred, there would have been no dispute that the jackpot in this case was won. Both the forensic evidence and the eyewitness testimony would have matched. Although there was forensic evidence that a jackpot win did not occur, there was the testimony of four eyewitnesses that a win did occur.
IGT contends that its forensic evidence is conclusive regarding whether or not a jackpot was won. Nevertheless, even IGT's witnesses admitted that nothing is infallible. Additionally, the plaintiff's expert, Mr. Rich, explained that there are ways that the data from the game in which the plaintiffs allegedly won the progressive jackpot could have been lost prior to the delivery of the computer's microprocessor to the GLI testing laboratory. He testified that when the power to a slot machine is turned off and then turned on again, it is possible to lose the data of the game that was last played. Also, Mr. Oatman, who performed the forensic testing, admitted that on the videotape of the forensic testing, he said at one point that the data had been lost. Although he claimed that he misspoke when he said that, the jury could have determined that he did not misspeak and that the data of the winning game had been lost.
The jury weighed the evidence and concluded that the evidence presented by the plaintiffs had more probative value than the evidence presented by IGT. The jury may have also made credibility determinations regarding the veracity of the testimony of the witnesses. Thus, we cannot say that the jury's decision was clearly wrong or manifestly erroneous. Therefore, even if we disagree with the jury, we cannot substitute our judgment for the factual determination made by the jury. See Rosell, 549 So.2d at 844.
IGT also asserts in its assignment of error that the law prohibits the payment of a jackpot when a slot machine has malfunctioned. In the instant case, however, the plaintiffs do not disagree that a malfunction or reel tilt occurred in the Wheel *217 of Fortune machine. They are simply claiming that the malfunction occurred after the completion of the game in which they allegedly won the progressive jackpot. The bet is wagered when the game is played, and when the game is completed, the result is final. A machine malfunction that occurs subsequent to a jackpot being legitimately won does not invalidate the jackpot. The phrase "any malfunction voids all plays and pays" that was displayed on the Wheel of Fortune slot machine clearly does not apply to a play that has been completed or to a jackpot that has already been won prior to the malfunction.
We do not find that the trial court or the jury erred as a matter of law in determining that the plaintiffs won the jackpot. These assignments of error are without merit.
Assignment of Error C: The trial court erred in accepting Todd Rich as an expert and allowing him to testify on behalf of the plaintiffs.
In this assignment of error, IGT argues that Mr. Rich was unqualified to act as an expert witness. IGT asserts that because Mr. Rich neither examined the Wheel of Fortune slot machine on which the progressive jackpot was allegedly won by the plaintiffs nor the data extracted from the machine's microprocessor, he simply advocated a particular factual finding based on the same evidence that was presented to the jury.
La. C.E. art. 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of any opinion or otherwise." In Cheairs v. State of Louisiana, through the Department of Transportation and Development, 03-0680, p. 6 (La.12/3/03), 861 So.2d 536, 541, the Louisiana Supreme Court stated that "[a] district court's decision to qualify an expert will not be overturned absent an abuse of discretion." Additionally, the Supreme Court in Cheairs also stated that "[g]enerally, the fact that a witness does not have a college degree does not disqualify him from testifying as an expert if the witness has sufficient experience." 03-0680, p. 8, 861 So.2d at 542.
Although Mr. Rich did not have a college degree, as did several of the witnesses for IGT, he testified that he had received equivalent training while he was in military service. Additionally, he had worked for GLI where he said that he tested slot machines, assisted in opening casinos, and trained gaming personnel. Mr. Rich also testified that he had tested progressive slot machines with respect to all aspects of the machines' play to make certain that the machines were functioning properly. He had also been the lead field agent for Harrah's temporary casino in New Orleans, and in that position he was required to assure that the casino complied with state regulations in connection with progressive slot machines.
Mr. Rich was qualified as an expert primarily with regard to the manner in which progressive slot machines "operate and run to completion and display an outcome." Based on Mr. Rich's experience and training, we cannot say that the trial court judge abused her discretion in accepting Mr. Rich as such an expert. Although Mr. Rich admitted that he could not independently determine whether the Wheel of Fortune machine validly selected a winning combination of numbers by random number generation, he did testify regarding how progressive slot machines function and how game data is stored and retrieved from a slot machine.
*218 The jury was free to accept or reject Mr. Rich's testimony, but the trial court judge was properly acting within her discretion when she accepted Mr. Rich as an expert witness. This assignment of error is without merit.
Assignment of Error D: The trial court erred when it excluded evidence of Garrett Griggs' criminal history.
La. C.E. art. 609 sets forth the rules pursuant to which evidence of a criminal record may be introduced in a civil case for the purpose of attacking the credibility of a witness. The general rule is that no evidence of the details of a crime of which a witness was convicted may be introduced into evidence. It is, however, permissible to introduce "evidence of the name of the crime of which he was convicted and the date of the conviction," provided that the crime meets certain requirements. Pursuant to article 609 evidence of the conviction may be introduced if the crime:
(1) Was punishable by death or imprisonment in excess of six months under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party; or
(2) Involved dishonesty or false statement, regardless of the punishment.
La. C.E. art. 609(A)(1)-(2). Further, evidence of a criminal conviction cannot be admitted into evidence if more than ten years have elapsed since the conviction. La. C.E. art. 609(B).
We have reviewed the proffered evidence of Mr. Griggs' criminal convictions. Within the ten-year time limitation for the introduction of evidence on Mr. Griggs' criminal convictions, he was convicted of possession of marijuana in violation of La. R.S. 40:966 D[5], of committing simple criminal damage to property valued at less than $500 in violation of La. R.S. 14:56, and of the unlawful use of a driver's license in violation of La. R.S. 32:414.1. Additionally, he was convicted of simple assault and of simple battery. None of the crimes of which Mr. Griggs was convicted was punishable by imprisonment in excess of six months, and none involved dishonesty or false statement. Therefore, under the rules of evidence set forth in La. C.E. art. 609, the convictions were not admissible.
IGT also asserts that Mr. Griggs' attorney stated in his closing argument that Mr. Griggs was "no criminal" and implied that Mr. Griggs had no criminal record. IGT further complains that the trial court judge refused to give a curative instruction asking the jury to disregard any comment made by Mr. Griggs' attorney concerning Mr. Griggs' criminal record. Although Mr. Griggs' attorney was clearly wrong in making the statements he did, we find that the trial court judge's failure to give the jury a curative instruction was harmless error.
We find that the evidence regarding Mr. Griggs' criminal convictions that was proffered by IGT was not admissible evidence. This assignment of error is without merit.
Assignment of Error E: The trial court erred in refusing to allow the jury to see a demonstration video prepared by IGT.
IGT contends that it should have been allowed to introduce into evidence a *219 videotape of a Wheel of Fortune slot machine "nearly identical to the one at issue." The videotape, according to IGT's argument, would have demonstrated to the jury how the Wheel of Fortune slot machine operates when various types of malfunctions occur and how the machine indicates that a jackpot has been won.
La. C.E. art. 401 provides that "[r]elevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. C.E. art. 402 provides that except as otherwise provided by the state and federal constitutions, the Louisiana Code of Evidence, or other laws, "[a]ll relevant evidence is admissible." La. C.E. art. 402 also provides that "[e]vidence which is not relevant is not admissible." La. C.E. art. 403 permits otherwise relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."
The provisions of article 403 give the trial court judge wide latitude in determining when relevant evidence should be excluded. In Jones v. Peyton Place, Inc., 95-0574, pp. 11-12 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 763, this Court stated that "[a] trial court's ruling on such evidentiary issues will not be disturbed unless a clear abuse of discretion is shown." In the instant case, we cannot say that the trial court judge clearly abused her discretion in deciding to exclude the videotaped evidence.
We have reviewed the proffered videotape, and it shows what occurs visually and aurally when various types of reel tilts are simulated and when a jackpot win is simulated. With respect to the simulated malfunctions, only one of the tilts involving the third reel was relevant in the instant case. Additionally, the reel tilt was simulated, and it was not simulated on the Wheel of Fortune slot machine on which the plaintiffs allegedly won the progressive jackpot. Finally, in the videotape there was a substantial amount of time spent on reel tilts that were not relevant in the instant case.
We do not find that the trial court judge abused her discretion in refusing to permit the videotape to be introduced into evidence. Even if the trial court erred in not permitting the videotape to be shown to the jury, the error would have been harmless. This assignment of error is without merit.

CONCLUSION
We find that the trial court jury's decision in this case was not manifestly erroneous or clearly wrong and that any error committed by the trial court judge was harmless error. Therefore, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] A progressive slot machine is a machine that is linked by computer to similar slot machines in other casinos. Each linked slot machine contributes money from that machine to a single jackpot, which is called a progressive jackpot. The progressive jackpot is much larger than any jackpot a single slot machine could pay. Often the manufacturer of the progressive slot machines is the owner of the machines and is responsible for paying the progressive jackpots that are won. In the instant case, IGT manufactured and owned the Wheel of Fortune slot machine and was responsible for paying any progressive jackpots won on that machine.
[2] A tilt is a malfunction in a slot machine.
[3] A microprocessor is the controlling unit of a computer. The microprocessor contains the silicon computer chip that is the "brain" of the computer.
[4] At the time of the trial, Mr. Oatman was employed by another company.
[5] La. R.S. 40:966 D was recodified after Mr. Griggs' conviction, and that statute is now codified as La. R.S. 40:966 E. The penalty for a first conviction of possession of marijuana is a fine of $500.00, imprisonment for not more than six months, or both, whereas the penalties for subsequent convictions are greater. Because the proffer does not indicate otherwise, we must assume that Mr. Griggs' conviction for possession of marijuana was his first.